IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NASHVILLE UNDERGROUND, LLC,    )
    )
    Plaintiff,    )    NO. 3:20-cv-00426
    )
v.    )    JUDGE RICHARDSON
    )
AMCO INSURANCE COMPANY,    )
    )
    Defendant.    )

## MEMORANDUM OPINION

Pending before the Court is Defendant AMCO Insurance Company's Motion to Dismiss (Doc. No. 10, "Motion"), supported by an accompanying Memorandum of Law (Doc. No. 11). Plaintiff Nashville Underground, LLC filed a response (Doc. No. 22, "Response"), and Defendant filed a reply (Doc. No. 24, "Reply"). For the reasons stated herein, Defendant's Motion will be granted.

## BACKGROUND[1]

Plaintiff Nashville Underground, LLC is a nationally acclaimed, seven-story restaurant, bar, night club and live music venue located directly on Broadway, a popular tourist destination, in downtown Nashville, Tennessee. (Doc. No. 1-3 at ¶ 7). Plaintiff generates significant revenue from private events, live music performances, DJ events, food sales and alcohol sales. (*Id*.). Plaintiff does not derive any revenue from drive-thru, curbside pickup or delivery service. (*Id*.).

---

[1] The cited facts are alleged in the Amended Complaint and accepted as true for purposes of the instant motion to dismiss.

Plaintiff renewed its commercial insurance policy (Policy Number ACP CPAA 30-2-8529549, "Policy") with Defendant AMCO Insurance Company on November 22, 2019 for coverage from the date of purchase through November 22, 2020. (*Id*. at ¶ 8). The Policy provided indemnification for property loss and business income loss. (*Id*.).

In February 2020, the first case of COVID-19 was reported in the United States. (*Id*. at ¶ 10). On March 12, 2020, the Governor of Tennessee signed Executive Order No. 14, declaring a state of emergency in order to facilitate a response to the spread and effects of COVID-19. (*Id*. at ¶ 11). On March 15, 2020, the Nashville-Davidson County Board of Health issued a Declaration, thereby directing the Chief Medical Director to order the closure of certain businesses, including all restaurants and bars which sold more alcohol than food (hereinafter referred to as "limited-service restaurants", which is the term used to describe such restaurants in Tenn. Code Ann. § 57-4-102(22)). (*Id*. at ¶ 12). The Declaration stated that "basic precautions of infection control and prevention, including . . . practicing respiratory and hand hygiene" and that "COVID-19 is a communicable disease with significant morbidity and mortality, and presents a severe danger to public health." (*Id*.).

On March 17, 2020, the Chief Medical Director issued an order closing all limited-service restaurants. (*Id*. at ¶ 13). Plaintiff was in the category of business closed by the Chief Medical Director's Order; thus, Plaintiff was forced to fully shutter its business, thereby losing all of its business income. (*Id*. at ¶ 14). On March 22, 2020, Tennessee Governor Bill Lee issued Executive Order No. 17, which effectively closed all restaurants and bars, with the exception of restaurants which served menu items via drive-thru, curbside pickup and/or delivery. (*Id*. at ¶ 15). Executive Order No. 17 admonished the public to limit the spread of COVID-19 by "practicing good personal hygiene, including washing hands, especially after touching any frequently used item or surface,

avoiding touching the face, and disinfecting frequently used items and surfaces as much as possible." (*Id*. at ¶ 16). Prior to closure of Plaintiff's business, one or more of Plaintiff's employees believed they were in contact with an individual infected with COVID-19 or had been in contact with an individual infected with COVID-19. (*Id*. at ¶ 17).

On March 16, 2020, Plaintiff gave notice of its losses and damages to Defendant by promptly notifying Defendant pursuant to the Policy by filing a claim. (*Id*. at ¶ 20). On March 23, 2020, Defendant denied Plaintiff's claim, asserting that any loss resulting from a virus, as well as any losses related to a closure by civil authority, were excluded. (*Id*. at ¶ 21). Defendant conveyed this denial verbally over the phone and via a denial letter. (*Id*.). On March 26, 2020, Plaintiff resubmitted its claim for additional consideration, and on April 1, 2020, Defendant again denied the claim. (*Id*. at ¶ 22). The adjuster for Defendant denied the claim, in part, because no evidence or report of food contamination was provided. (*Id*. at ¶ 25).

Plaintiff initially filed this lawsuit in the Circuit Court for Davidson County, Tennessee, asserting various claims based on Defendant's denial of Plaintiff's above-described claim for insurance coverage. (Doc. No. 1-1). Plaintiff thereafter filed an amended complaint in that court asserting two claims: breach of contract and a request for a declaratory judgment stating that Plaintiff's losses were covered losses under the Policy. (Doc. No. 1-3, "Amended Complaint"). On May 19, 2020, Defendant removed the case to this Court. (Doc. No. 1). On June 9, 2020, Defendant filed the instant Motion, arguing that both of Plaintiff's claims should be dismissed because (according to Defendant) under the plain language of the Policy, Plaintiff's alleged losses are not covered. (Doc. No. 10; Doc. No. 11 at 1). The Motion is now ripe for decision.

## LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 1950. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations – factual

allegations, *i.e.*, allegations of factual matter – plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.*, 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## ANALYSIS

### I. Choice of Law

In a diversity action, the choice-of-law rules of the forum state apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). Here, the forum state is Tennessee. "In Tennessee, absent a valid choice of law provision, the rights and obligations under an insurance policy are governed by the law of the state where the

insurance policy was 'made and delivered.'" *Charles Hampton's A-1 Signs, Inc. v. Am. States Ins. Co.*, 225 S.W.3d 482, 485 n.1 (Tenn. Ct. App. 2006) (quoting *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)); *see also Onebeacon Am. Ins. Co. v. Jaco Airfield Constr., Inc.*, Nos. 04-2432 B, 03-2649 B, 2007 WL 1039355, at *3 (W.D. Tenn. Apr. 2, 2007) ("In the absence of an enforceable choice of law clause in an insurance policy, Tennessee courts apply the substantive law of the state in which the policy was issued and delivered").

Here, Defendant issued the Policy to Plaintiff—a business with its sole location in Nashville, Tennessee. (Doc. No. 1-3 at ¶ 2; Doc. No. 10-2 at 2).[2] Thus, the Policy was issued and delivered in Tennessee, and Tennessee law governs the interpretation of the Policy absent an enforceable choice-of-law clause specifying the law of some other state. *Charles Hampton's A-1 Signs, Inc.*, 225 S.W.3d at 485 n.1. The parties do not point out a choice-of-law clause in the Policy, and the Court's own review of the Policy does not reveal one. Additionally, the parties appear to be in agreement that Tennessee law applies to the interpretation of the Policy, as both parties cite and rely upon Tennessee law in their filings related to the Motion. Therefore, the Court concludes that Tennessee substantive law governs the Policy.

## II. Tennessee Contract Law

Under Tennessee law, "[a]n insurance policy is a contract, and as such, [the court's] analysis must be grounded in principles of contract law." *Christenberry v. Tipton*, 160 S.W.3d 487, 492 (Tenn. 2005); *see also Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 527 (Tenn. 2012) (Koch, J., dissenting) ("Insurance policies are, at their core, contracts."). Thus, the terms of an insurance policy "should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties." *Garrison v. Bickford*, 377

---

[2] The Court may consider the Policy at the motion-to-dismiss stage because the Policy is referred to in the pleadings and is integral to Plaintiff's claims. *Blanch*, 333 F. Supp. 3d at 791-92.

S.W.3d 659, 663 (Tenn. 2012); *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012). When the language of an insurance policy is clear and unambiguous, the court is bound to give effect to that language. *Clark*, 368 S.W.3d at 441.

When a contract is unambiguous, a court may determine the interpretation on a motion to dismiss as a matter of law, but when a contract is ambiguous, a court should not interpret the contract at the motion to dismiss stage. *E.g.*, *McKee Foods Corp. v. Pitney Bowes, Inc.*, No. 1:06-CV-80, 2007 WL 896153, at *3 (E.D. Tenn. Mar. 22, 2007) ("Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. In such a situation, contractual interpretation is a matter of law and may be addressed on a motion under Rule 12. When a contract's terms are ambiguous, however, interpretation is a question of fact and is not appropriately decided in the context of Rule 12." (internal citations omitted)); *Griggs v. LF Prod. PTE Ltd.*, No. 1:12-CV-00193, 2013 WL 4499131, at *4 (M.D. Tenn. Aug. 16, 2013) ("Resolution of contractual claims on a motion to dismiss is proper if the terms of the contract are unambiguous." (quotation omitted)); *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012) ("In reviewing a Rule 12(b)(6) motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in Plaintiffs' favor. A contract is ambiguous if its words may reasonably be understood in different ways. A court should not choose between reasonable interpretations of ambiguous contract provisions when considering a motion to dismiss under Rule 12(b)(6). In other words, the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." (internal citations omitted and cleaned up)); *BorgWarner Ithaca LLC v. Principal Mfg. Corp.*, No. 18-CV-13970, 2019 WL 1952858, at *3 (E.D. Mich. May 2, 2019) (applying *Ajuba*); *cf. Perry v. Allstate Indem. Co.*, 953 F.3d 417, 432

(6th Cir. 2020) (Readler, J. concurring in part and dissenting in part) ("While it may be the majority view, we cannot say at this threshold stage, as did the district court, that [Defendant's] view is the only potentially reasonable interpretation of the policy language. True, as [Defendant] notes, one court's aberrant decision cannot unsettle the meaning of well-defined legal terms. But that is not what we have here. Both [Defendant] and [Plaintiff's] views have ample support. All things considered, including the somewhat detailed discussion necessary to explain these competing views, we find that, at this stage, both views are reasonable. Under Ohio law, [Plaintiff's] claim therefore survives [Defendant's] Rule 12(b)(6) motion.").

There is also some case law that indicates (without distinguishing between ambiguous and unambiguous contracts) that it is generally inappropriate to interpret a contract on a motion to dismiss. *DeNune v. Consol. Capital of N. Am., Inc.*, No. 3:02CV7241, 2004 WL 1474653, at *2 (N.D. Ohio May 21, 2004) ("Contract interpretation is inappropriate for a motion to dismiss."); *In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, No. 2:03-MD-1565, 2006 WL 2849784, at *7 (S.D. Ohio Oct. 3, 2006) ("The Court, though, will not resolve a conflict in contract interpretation on a motion to dismiss."); *Exact Software N. Am., Inc. v. Infocon Sys., Inc.*, No. 3:03CV7183, 2004 WL 952876, at *5 (N.D. Ohio Apr. 16, 2004) (same). Taking a somewhat contrary position, the Court believes that it is appropriate to interpret a contract on a motion to dismiss—but only if the contract is unambiguous.

### III. Analysis

In its Response to Defendant's Motion, Plaintiff clarifies that it seeks coverage under only the Food Contamination provision of the Policy.[3] That provision provides:

---

[3] Specifically, Plaintiff asserts that it "primarily seeks coverage under the Food Contamination Endorsement" and in a footnote says "Plaintiff only pled coverage based on the Food Contamination Endorsement, however, to the extent that Defendant has submitted arguments regarding coverage from other terms and conditions found in the

Food Contamination Endorsement

A. The following is added to Additional Coverages:

Food Contamination

1. If the business described in the Schedule is ordered closed by the Board of Health or any other governmental authority as a result of the discovery or suspicion of "food contamination", we will pay:

> a. Your expense to clean your equipment as required by the Board of Health or any other governmental authority;

> b. Your cost to replace the food which is, or is suspected to be, contaminated;

> c. Your expense to provide necessary medical tests or vaccinations for your employees (including temporary and leased employees) who are potentially infected by the "food contamination". However, we will not pay for any expense that is otherwise covered under a Workers' Compensation Policy;

> d. The loss of Business Income you sustain due to the necessary "suspension" of your "operations" as a result of the "food contamination". The coverage for Business Income will begin 24 hours after you receive notice of closing from the Board of Health or any other governmental authority; . . . .

B. For the purposes of this endorsement, "food contamination" means an outbreak of food poisoning or food-related illness of one or more persons arising out of:

> 1. Tainted food you distributed or purchased;

> 2. Food which has been improperly processed, stored, handled or prepared in the course of your business operations; or

> 3. Food which has been contaminated by virus or bacteria transmitted through one or more of your employees, including temporary and leased employees.

---

Policy, Plaintiff concedes that the Bacteria and Virus exclusion, at least under the current state of the law, precludes coverage from other provisions found in the policy." (Doc. No. 22 at 3).

(Doc. No. 10-2 at 73). Notably, it is the third of these alternative definitions of food contamination on which Plaintiff relies; the Amended Complaint, and Plaintiff's Response, do not suggest in any way that this case involves anything that could be deemed tainted or improperly handled food, except to the extent that the food is "contaminated by virus . . . transmitted through" employees. The Court's analysis thus will focus on the third alternative notion of "food contamination."

Defendant argues that the Food Contamination Endorsement does not provide coverage for Plaintiff's alleged losses. Defendant asserts that as a condition of coverage, this endorsement unambiguously requires, among other things, that (1) the insured premises is ordered closed by the applicable governmental authority (*i.e.*, the Board of Health); and (2) the closure is the result of the discovery or suspicion of "food contamination," *i.e.*, food poisoning or food related illness. (Doc. No. 11 at 14). Defendant argues that the First Amended Complaint does not contain any allegations of closure due to discovered or suspected food contamination at Plaintiff's premises as would be necessary to plausibly allege the existence of coverage under the Food Contamination Endorsement. (*Id.*).

In response, Plaintiff argues that "coverage is provided if there is a 'suspicion' that food was 'contaminated by virus . . . transmitted through' an employee. That is precisely the scenario which led to the closure of Plaintiff's establishment, at least in part." (Doc. No. 22 at 6). Plaintiff argues that it sufficiently pled that it was required to close due to "suspicion" of food contamination when it alleged the following: "Nashville Underground is in the category of business closed by Chief Medical Director's Order, and, thus, Nashville Underground was forced to fully shutter its business, thereby losing all of its business income" and "Upon information and belief, restaurants and bars were closed, in part, because the Board of Health and Chief Medical Director were attempting to limit the spread of Coronavirus through contamination of food, the conveyance of

food, contamination of employees and the contamination of the interior, structure, furnishings, fixtures and equipment of the restaurants and bars." (*Id*. at 4 (citing Doc. No. 1 at ¶¶ 11, 14)). In short, Plaintiff's primary theory is that the general category of businesses into which it falls (limited-service restaurants) were closed as the result of suspicion of "food contamination" within the meaning of the Policy; thus, Plaintiff contends that it (like all limited-service-restaurants) was closed as a result of suspicion of food contamination and therefore is entitled to coverage.

Plaintiff seems to suggest (albeit rather tentatively) a second theory applicable to itself in particular as opposed to limited-services restaurants generally; construed most strongly in Plaintiff's favor, one paragraph of the Complaint alleges (on "information and belief" only) that one or more of Plaintiff's employees were in contact with someone actually infected by COVID-19. (*Id.* at ¶ 18). Erring on the side of caution in Plaintiff's favor, the Court construes this as an attempt to allege that there were circumstances at Plaintiff's establishment in particular that created a "suspicion" of food contamination.

In its Reply, Defendant argues that Plaintiff's interpretation of the Food Contamination Endorsement "is very strained and unworkable construction that does not comport with the long-standing principles governing contract interpretation." (Doc. No. 24 at 2). Defendant asserts that Plaintiff's alleged losses are not covered under the Food Contamination Policy because Plaintiff was not ordered to close. According to Defendant, the governmental orders mentioned in the Complaint did not require the closures of all business and, in fact, restaurants were allowed to stay open for food delivery and take out. Additionally, Defendant contends that Plaintiff fails to allege coverage under the Food Contamination Endorsement because the restrictions placed on restaurants were not the result of the suspicion of "food contamination" as that term is defined by the policy—*i.e.*, "an outbreak of food poisoning or food-related illness."

The Court agrees with Defendant that Plaintiff fails to plausibly allege coverage under the Food Contamination Endorsement, for three separate reasons: (1) Plaintiff has not plausibly alleged circumstances involving any suspicion of "food contamination," *i.e.*, suspicion of "an outbreak of . . . food-related illness of one or more persons arising out of . . [f]ood which has been contaminated by virus or bacteria transmitted through one or more of your employees,";[4] (2) even if Plaintiff had plausibly alleged circumstances involving suspicion of "food contamination," Plaintiff has not plausibly alleged that the governmental orders required limited service restaurants as a group to close *because of* suspicion of food contamination, and (3) Plaintiff has not plausibly alleged that it was the object of suspicion of "an outbreak of . . . food-related illness" at its establishment.

First, the Court finds that the Amended Complaint does not plausibly allege any suspicion of "food contamination," whether at limited-service restaurants generally or at Plaintiff's limited-service restaurant in particular. That is, properly construed, the term unambiguously does not apply to the circumstances alleged in the Amended Complaint, which simply does not allege a suspicion of the kind of "food contamination" alleged by Plaintiff, *i.e.*, "outbreak of . . . food-related illness of one or more persons arising out of . . . food which has been contaminated by virus or bacteria transmitted through" limited-service restaurant employees. (Doc. No. 10-2 at 73). At the very most the Amended Complaint alleges that government officials suspected that this kind of outbreak *could occur* at limited-services restaurants. But in the Court's view, the policy is unambiguous: "food contamination," including of the particular type Plaintiff claims was the object of suspicion,

_____

[4] The ellipses reflect omissions that are appropriate because the Amended Complaint does not appear to claim in any way that COVID-19 causes or is associated with "food poisoning"; this case instead implicates only the possibility of "food-related illness." Likewise, as suggested in a footnote below, this case does not implicate *discovery* of [actual] food contamination; instead, it implicates only the possibility of *suspicion* of food contamination. The Court will frame its discussion accordingly.

refers only to something that already has occurred. The relevant language of the Food Contamination Endorsement uses exclusively the past tense or present perfect tense, each of which (in the English language, at least) is used unambiguously to refer to *events that occurred in the past*. It follows that suspicion of food contamination refers to *suspicion* that something *has already occurred*, and not to *concerns* that something could occur *presently or in the future*. This conclusion is bolstered by the fact that "food contamination" means an outbreak of food-related illness "*of one or more persons . . . .*" This strongly suggests that [suspicion of] "food contamination" can occur only if there is [suspicion of] one or more particular persons *actually having become ill*; if suspicion of "food contamination" could exist based merely on a generalized concern that there *could* be an outbreak of food-related illness that *potentially could* hit the population, then surely "of one or more persons" would be superfluous.[5]

The Amended Complaint refers only to the latter, *i.e.,* concerns that an outbreak of food-related illness could occur. Its main allegations about the health orders at issue is stated in back-to-back paragraphs as follows:

> On or about March 15, 2020, in response to the fear of the spread of the Coronavirus, the Nashville-Davidson County Board of Health issued a Declaration thereby directing the Chief Medical Director to order the closure of certain businesses, including, all restaurants and bars which sold more alcohol than food. Within this resolution, the Board of Health stated that the basis of its Declaration was, *inter alia*, to implement "basic precautions of infection control and prevention, including . . . practicing respiratory and hand hygiene" and that "COVID-19 is a communicable disease with significant morbidity and mortality, and presents a severe danger to the public health."

---

[5] If the insured could establish coverage by showing merely that there were concerns about a potential outbreak of food-related illness, it would serve no purpose for the Policy to qualify "outbreak of food-related illness" with "of one or more persons." If an insured could show an order was prompted by concerns about a potential outbreak of food-related illness, then the insured necessarily could show that the order was prompted by concerns about a potential outbreak of food-related illness "of one or more persons." But the phrase "of one or more persons" *would* serve a purpose if the insured could establish coverage for suspicion of food contamination only by showing suspicion of an actual (past) outbreak of food-related illness; the phrase would highlight the fact that the insured must show one or more particular persons who were suspected to be victims of food-related illness. In other words, it would highlight that the insurer essentially gets to demand, as a prerequisite to coverage, "Show us that there was suspicion that someone actually suffered a food-related illness."

Upon information and belief, restaurant and bars were closed, in part, because the Board of Health and the Chief Medical Director were attempting to limit the spread of the Coronavirus through contamination of food, the conveyances of food, contamination of employees and the contamination of the interior, structure, furnishings, fixtures and equipment of the restaurants and bars.

(Doc. No. 1-3 at ¶¶ 12, 13). And along the same lines, The Amended Complaint further alleges:

On or about March 22, 2020, Tennessee Governor Bill Lee issued Executive Order No. 17, which effectively closed all restaurants and bars, with the exception of restaurants which served menu items via drive-thru, curbside pickup and/or delivery. Nashville Underground's business model does not include providing menu items via drive-thru, curb side pickup and/or delivery services.

The aforementioned Executive Order additionally admonished the public to limit the spread of the Coronavirus by "practicing good personal hygiene, including washing hands, especially after touching any frequently used item or surface, avoiding touching the face, and disinfecting frequently used items and surfaces as much as possible."

(*Id.* ¶¶ 15-16). The allegations reflect only governmental concern that, absent appropriate COVID-19 countermeasures (including the relevant closure of limited-service restaurants) going forward, COVID-19 could spread. The cited portions of these governmental orders in no way reflect governmental *suspicion* about what had happened in the past; they do not suggest that COVID-19 had spread in any particular way in the past, and still less do they express any suspicion that food previously had been contaminated with the coronavirus through employees of limited-service restaurants. In short, even if the challenged orders could be construed to have been prompted in part by what had happened in the past—and not solely by what may happen in the present and in the future—they were not (and perhaps could not reasonably have been) alleged to have been prompted by past *food contamination*.

As noted above, generously construed, the Amended Complaint does allege that one or more of Plaintiff's employees at some point were in contact with someone actually infected by COVID-19 on or before the closure of Plaintiff's business. It does not allege, however, what it

needs to; it does not allege that anyone at all (be it government officials, Plaintiff's employees or management or anyone else) had a suspicion that some of Plaintiff's food contacted by these employees was contaminated by the coronavirus that causes COVID-19. Less directly relevant, but also noteworthy, is the fact that Plaintiff does not allege that some of its food was contaminated by the coronavirus.

Plaintiff argues that "the Food Contamination Endorsement does not require an actual report of 'contamination', it only requires the 'suspicion' of 'food contamination.'" (Doc. 22 at 4-5). Although true as far as it goes, this observation does not help Plaintiff, because the requirement of "suspicion" of food contamination is a requirement of *suspicion* of *past* food contamination, not a mere *concern* of food contamination in the present or future.[6] Plaintiff simply has failed to allege the former as required to prevail on this Motion; the Amended Complaint refers to no actual or even suspected instances at its own or indeed any limited-service restaurant in which someone sustained an "illness" arising out of food contaminated by the coronavirus, let alone food contaminated by the coronavirus transmitted by an employee of the limited-service restaurant.

---

[6] Plaintiff improperly conflates the two when he argues:

Government officials certainly were *concerned* with individuals being in close proximity with other guests and the staff, but likewise, logically, health officials were *concerned* about the numerous exchanges of items between employees and guests, to include food and the conveyances of food: forks, knives, plates, bowls, cups, etc. Therefore, the *"suspicion"* of food contamination certainly was part of the rational for health officials to close Plaintiff's establishment as such is a reasonable inference from the governmental orders.

(Doc. No. 22 at 7). Plaintiff here equates *concerns* about the potential consequences of present and future events with *suspicion* that particular consequences ensued in the past. But the Food Contamination Endorsement unambiguously is concerned with the latter. As for Defendant, it does not expressly rely specifically on the key distinction the Court is making here, but this distinction does go directly to the argument Defendant does make, which is that the Amended Complaint fails to allege as required that closure of Plaintiff's establishment came *after* a (past) instance of food contamination.

Plaintiff's theory of coverage fails for this reason alone, irrespective of the various arguments of the parties regarding the extent to which COVID-19 is a food-related illness and the extent to which the coronavirus can contaminate food. *Id.*

Second and alternatively, even if "suspicion of . . . food contamination" could be deemed to apply to mere *concerns* that food *could* be contaminated by coronavirus transmitted by employees of limited-service restaurants, the Amended Complaint does not plausibly allege that public health orders regulating food-service establishments were implemented due to such concerns.

The Amended Complaint alleges that on March 17, 2020, "the Chief Medical Director issued an order closing all establishments that sold more alcohol than food." (Doc. No. 1-3 at ¶ 13). As a business categorized as one selling more alcohol than food (*i.e.*, limited-service restaurants), Plaintiff thus was required to close. (*Id*. at ¶ 14). However, additional language in that same order, of which the Court takes judicial notice,[7] allowed businesses whose primary business was food service to remain open with capacity limitations. *See Health Director Order 1: Suspending Bars an Limiting Restaurant Capacity*, Nashville.gov, https://www.nashville.gov/Metro-Clerk/Legal-Resources/Emergency-Health-Orders/Order-1.aspx (last accessed Feb. 23, 2021) ("Order 1"). On March 20, 2020, the Chief Medical Director amended Order 1 and suspended in-person dining, but allowed *both* establishments that sold more alcohol than food *and* establishments whose primary business was food service to prepare food or

---

[7] The Court may consider these public health orders at the motion-to-dismiss stage because they are public records of official government action and thus subject to judicial notice by the Court. *See New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice"), *abrogated on other grounds by Merck & Co. v. Reynolds*, 559 U.S. 633 (2010); *Roane Cty., Tennessee v. Jacobs Eng'g Grp., Inc.*, No. 3:19-CV-206-TAV-HBG, 2020 WL 2025613, at *3 (E.D. Tenn. Apr. 27, 2020) ("the Court may take judicial notice of public records and government documents available from reliable sources on the Internet.").

beverages, receive call-in orders, and participate in take out, curbside, and delivery services. *See Health Director Order 1A: Suspending Restaurant Dining Rooms*, Nashville.gov, https://www.nashville.gov/Metro-Clerk/Legal-Resources/Emergency-Health-Orders/Order-1A.aspx (last accessed Feb. 23, 2021) ("Order 1A"). Order 1A thus allowed businesses that sold more alcohol than food, like Plaintiff, to reopen and participate in food sales. Through the above allegations, however, the Amended Complaint clearly alleges that Plaintiff's business was required to close by the Chief Medical Director, a governmental authority, for three days (from March 17 to March 20, 2020).

Thus, were it not unambiguously inapplicable as discussed above, the Food Contamination Endorsement conceivably could provide coverage for Plaintiff's losses because it was actually ordered closed by a governmental authority (the Chief Medical Director) for at least three days. And the Court will assume *arguendo* that Governor Lee's Executive Order No. 17 dated March 22, 2020, mentioned in Paragraph 17 of the Amended Complaint could be deemed ambiguous with respect to whether it ordered limited-service restaurants to be "closed."[8] So for purposes of the Motion, Plaintiff has shown that it was "closed" via two different governmental orders.

However, as suggested above, the unambiguous language of the Policy proscribes Plaintiff another hurdle to coverage—the Food Contamination Endorsement provides coverage *only* if

---

[8] The relevant language from Executive Order No. 17 reads as follows: "Restaurants, bars, and similar food or drink establishments, including nightclubs, shall not be open to persons, except only to offer drive-through, pickup, carry-out, or delivery service for food or drink . . . ." *See* State of Tennessee Executive Order No. 17, *https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee17.pdf* (last accessed March 1, 2021). Plaintiff certainly could argue that being ordered not to be open except to provide certain limited services is functionally equivalent to being ordered closed for establishments that (like Plaintiff, according to the Amended Complaint) simply do not provide the limited services based on their business model. (Doc. No 1-3 at ¶ 15) (alleging that Plaintiff's business remained closed because Plaintiff's "business model does not include providing menu items via drive-thru, curb side pick up and/or delivery service.") The counterargument, of course, is that restaurants were ordered "not to be open" only for some purposes, and not all purposes, and thus were not "closed" by the Executive Order (even if some, like Plaintiff's, were effectively closed as a result of *their* business model). The Court will assume *arguendo* that the Policy is ambiguous in this regard and thus should be construed in Plaintiff's favor for purposes of the Motion.

Plaintiff's business was "ordered closed . . . *as a result of the discovery or suspicion of 'food contamination.'*" (Doc. No. 10-2 at 73) (emphasis added). Plaintiff asserts that the Food Contamination Endorsement provides coverage because (in its view) it has alleged in its Amended Complaint that it was ordered closed as a result of the suspicion of food contamination that existed at its business.[9] (*See* Doc. No. 22 at 6-7).

The Court disagrees with Plaintiff because the Amended Complaint does not plausibly allege that Plaintiff's business was ordered closed *as a result* of a suspicion of food contamination at its business, even if it could be said (contrary to the Court's conclusion above) that Plaintiff has plausibly alleged "suspicion" (on the part of someone, at least) of "food contamination" as those terms are properly construed. If one assumes (contrary to the Court's conclusion above), that concerns about the possibility of present or future food-related illness caused by coronavirus contamination qualify as "suspicion" of food contamination, Plaintiff still needs to plausibly allege that any order(s) to close resulted from such concerns. And Plaintiff has not done so.

In the March 17 order upon which Plaintiff relies the Chief Medical Director ordered the closure of businesses that serve more alcohol than food, but he allowed businesses whose primary business was food service to remain open and serve food during this three-day period. Thus, the Chief Medical Director's order closing limited-service restaurants (*i.e.*, establishments that sold more alcohol than food) was clearly not done because of suspicion of food contamination at these businesses. If the Chief Medical Director had issued the order closing businesses such as Plaintiff's as a result of suspicion of food contamination via employees' transmission of the COVID-19 virus, then he undoubtedly would have also ordered the closing of businesses *whose primary business*

---

[9] In the Response, Plaintiff does not take the position that it has alleged that there was a discovery of food contamination at its business. Such position is understandable, as the Amended Complaint does not contain any allegations that plausibly suggest actual discovery of food contamination at Plaintiff's business.

*was food service*. So Plaintiff's allegations, far from plausibly suggesting that closure of limited-services restaurants generally (as a group) was ordered as a result of suspicion of any "food contamination" from the coronavirus, affirmatively suggest quite to the contrary—*i.e.*, that this closure order was driven by something else.[10]

Like Plaintiff's reliance on the Chief Medical Director's closure order, Plaintiff's reliance on Executive Order No. 17 fails because the Order itself suggests unequivocally that the Order was not issued as a result of "suspicion" of food contamination. That Order allows any limited-service restaurant (and indeed all restaurants) to sell food prepared by its employees—*as long as the food is not consumed on site*. Thus, it is simply not plausible that any closure of restaurants resulted from concern that food would be contaminated with the coronavirus through restaurant employees; if that had been the concern, "drive-through, pickup, carry-out, or delivery service for food or drink" would not have been permitted. The fact that those activities were permitted shows almost conclusively that the concern was with patrons being *on site*, not patrons being *exposed to food contaminated* with coronavirus by restaurant employees.[11]

<u>Third</u> and finally, Plaintiff has not plausibly alleged that coverage exists due to suspicion of food contamination at its business in particular. The closest Plaintiff gets is when it alleges that "[o]n or before the closure of Plaintiff's business, upon information or belief, one or more

---

[10] Although the Court need not say what the closure order actually resulted from, one might reasonably conclude that it was concern that the coronavirus could be transmitted directly person to person (irrespective of the presence of any food as an intermediary between persons) in limited-service restaurants, where social-distancing and other COVID-19 countermeasures may be minimized by crowding and alcohol-induced lessening of inhibitions that end to promote those countermeasures. This is evidenced by the fact that the orders were focused on capacity restrictions and social distancing (*i.e.*, "Physical distance between customers in line and delivery persons and recipients shall be maximized." (Order 1A)), rather than tainted food, or improperly stored, process, prepared, or handled food at any location.

[11] As suggested above, it would be reasonable to conclude (though the Court does not have to conclude one way or the other) that the concern with patrons being on site is a concern about challenges to social distancing, which is a concern about the spread of the coronavirus from person to person, not person to food to person.

employees believed they were in contact with an individual infected with the coronavirus or had been in contact with an individual infected with the coronavirus." (Doc. No. 1-3 at ¶ 17). However, Plaintiff does not allege that this possible exposure in any way affected the food at Plaintiff's business as to cause a "suspicion" of "food contamination." *See Whiskey River on Vintage, Inc. v. Illinois Cas. Co.*, ---F. Supp. 3d---, 2020 WL 7258575, at *17 (S.D. Iowa Nov. 30, 2020) (granting the defendant's motion to dismiss where the plaintiffs were seeking insurance coverage for losses due to government ordered COVID-19 related closures where "the policy clearly requires a governmental authority or a board of health to close the insured property as a result of the discovery or suspicion of contaminated food" and the "[p]laintiffs have not pled food contamination"). Nor does Plaintiff allege that any governmental authority was aware of such exposure, let alone that such awareness resulted in Plaintiff's closure. Plaintiff's lack of allegations in this regard is both highlighted and exacerbated by the fact that Plaintiff does not allege that it was the target of a specific closure order (or indeed any order) of any kind. Accordingly, because of the lack of any allegation of suspicion of food contamination at Plaintiff's business in particular, the Amended Complaint fails to allege coverage under the Food Contamination Endorsement based on anything related specifically to the happenings at Plaintiff's own location (including the events alleged in Paragraph 17 of the Amended Complaint).

For the above-stated reasons, the Court finds that given the relevant terms of the Policy (specifically, the Food Contamination Endorsement) that are unambiguous, the allegations in the Amended Complaint do not plausibly show that Plaintiff is entitled to coverage under the Policy. Thus, Plaintiff's declaratory judgment claim seeking a declaration that Plaintiff's losses were covered losses under the Policy is subject to dismissal. Additionally, Plaintiff's breach of contract claim fails as a matter of law, because there was not a breach of the insurance agreement by

Defendant's refusal to cover Plaintiff's losses, since Plaintiff has not plausibly alleged that it was entitled to coverage under the Policy.[12] Accordingly, Defendant's Motion to Dismiss will be granted.

CONCLUSION

Like many Americans, the undersigned can sympathize with Plaintiff and so many of our other small to medium-sized businesses that seem to have borne much of the brunt of the effects of the COVID-19 pandemic. One could understand if Plaintiff (or anyone else) lamented that it simply is not right that this should be the case. But it also is not right, or lawful, for a business's insurer to be on the hook for coverage it simply did not contractually commit to provide. Presumably like a myriad of other enterprises throughout this nation, Plaintiff in retrospect perhaps would have bargained for broader coverage but simply did not foresee such need before the unprecedented pandemic conditions arose in 2020. Accordingly, Plaintiff was unfortunately left without the coverage it now asks this Court to find in an insurance policy that simply does not provide it.

For the above-stated reasons, Defendant's Motion to Dismiss (Doc. No. 10) will be GRANTED. An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[12] Under Tennessee law, the elements for a breach-of-contract claim are: (1) the existence of an enforceable contract; (2) nonperformance amounting to breach of the contract; and (3) damages caused by the breach of contract. *Life Care Centers of Am., Inc. v. Charles Town Assoc. Ltd. P'ship*, 79 F.3d 496, 514 (6th Cir. 1996); s*ee ARC LifeMed, Inc. v. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).